Good morning again, Your Honors. I won't go over the requirements. The only thing that's different in this case, this is also a 751 case, regarding our client who was denied her petition for a 751. The differences I make in this case compared to the last case I presented to you is this petition was submitted by both the husband and wife. I will hit on some of the bullet points in our brief. This couple has been married to each other. I think we've read the brief. You might want to save your time for rebuttal and see, because our time is short today. Why don't you save your time for rebuttal and hear what the government says. Your Honor, I appreciate it. You have a full ten minutes then. Okay. Thank you, Your Honor. Welcome back, Ms. Smiley. Good morning. May it please the Court, Joan Smiley here on behalf of the Attorney General. This is an odd case, isn't it? These people are living together now, right? There was evidence in the record that they began living together in 1998, whether they're still living together or not. Did they fell in love after the fraud? Excuse me? Did they fell in love after the fraud? Possibly. But the evidence is clear in the record that it was not a bona fide marriage from its inception. There's a complete lack of documentary evidence relating to the marriage from 1989, when they got married, until 1998. The evidence of cohabitation begins, as Judge Reinhart observed, after the conditional residence status was terminated. Eleven years later, they started living together. This is certainly different from any other case. Well, it would be nine years, actually, from 89 to 98. The statements of friends in the records are not probative. First, there's no factual detail in them about the basis for which they state that the marriage was bona fide. We have a letter from Yolanda Hollingsworth. She says that she lived with the petitioner and her husband from 1989 to 1995, yet both petitioner and her husband contradicted that testimony and said they did not live with her. We have a letter from Mr. Bryce. He says that the husband, Mr. Thomas, told him a year after he met petitioner that they were getting married, but actually the marriage took place three months after they met. So his letter cannot be considered probative, either. The addresses where they say they lived is completely contradictory. Every document in the record just about contradicts each other. We have addresses in the naturalization application, addresses to which Mrs. Duangdon testified, addresses to which Mr. Thomas testified that they lived together, and none of them match. But don't we have, in this case, sort of cultural and linguistic differences in issues here where there are rational explanations for some of these differences? Well, I think it's hard to attribute to language or cultural differences the fact that one witness says that she lived with them for six years and then they testify that they didn't live with her. They were so honest they disavowed a false witness on their side. There's a rental statement that they submitted that appears on its face to be altered. It's all typed and then the husband's name is written in. The lease, the mailbox, and an August 8, 1998 rent increase notice are addressed to Petitioner and another man at that address, Mr. Thiemathat. The naturalization gives two addresses for Petitioner that are different from those on the other documents that she submitted. Her affidavit says that she was separated from him for six months in 1992. He says they were separated for one month. So there are just all of these differences rampant in the record, a total lack of evidence that they intended to establish a life together when they married, which is the standard that the administrative authorities look to. There's no specific adverse credibility finding here. No, there is not. But here the immigration judge did rule that a preponderance of the evidence did not support the application here. The board affirmed that. Well, you know, we have a general rule, which you're familiar in, I know, in our deportation cases, and it's been applied in the marriage case, that unless there's an express adverse credibility finding, you're required to take the testimony of the immigrant as true. What do you do with that rule in this case? Well, if we take the testimony as true, then we have one set of facts from the Petitioner, one set of facts from the husband, one set of facts from the witness, Ms. Hellingsworth, one set of facts from the witness, Mr. Bryce. You still have all of those conflicting witnesses and evidence. If we have to take hers as true, doesn't she win this case if you accept her testimony? No. As the administrative authorities found, there was just simply insufficient evidence, no evidence, that the marriage was bona fide at the time it was entered into, that there was no intent on the parties to establish a valid marriage. And, you know, the standard that we set out in the brief, you know, the board looks to the degree of commitment by both parties, documentation which we've discussed concerning financial assets, the length of time that they cohabitated, whether they intended to establish a life together. Taken together, the evidence in the record is abundantly clear that there is no evidence that they intended to cohabitate. The only thing that bothers me about this analytically is you're saying if you look at the other evidence, you find that her statements that they intended to live together and that they did are not true. And how can you say at the same time we have to take her statement as true and then say, but the other evidence shows it's not true? Well, I think the point that we're making is the evidence does not persuade that this is a bona fide marriage from its inception. They did have a marriage certificate. They had wedding pictures. They had life insurance policies. They had shared checks and rental statements. And then there were 13 affidavits and declarations which submitted generally that they had been married since 89. They had suffered some marital problems. And during the course of their, at that time, 11-year relationship, that they had reunited. There is some evidence there. Well, one of the factors you've mentioned, the joint checking account, that was opened after the termination of the conditional permanent residence. And, in fact, the only checks written on the account by the husband were to the attorney that they hired to challenge that. Furthermore, there's no documentary evidence that they lived together prior to the years that I've mentioned. There's a complete lack of documentation from 1989 to 1998. And although, yes, Your Honor, you're correct that there are statements in the record from other witnesses, they have no factual detail in them to support. Basically, they say that we believe that this is a bona fide marriage, but there's no basis for which they have come to that conclusion. And on the other hand, you have the other affidavit letters, excuse me, that I mentioned, that are highly suspect. So at bottom, the Board determined here that there was insufficient evidence to show that the marriage was bona fide at its inception. It's a little unusual because you have a dissent. I mean, I guess I haven't seen that in many of these cases. Well, that does occur at times, Your Honor. However, that does not. It doesn't change. No. Unless the Court has any further questions, the government would ask that the Board's decision be affirmed. Thank you, Judge. Thank you. Your Honors, I would just make a few points. I would note that the couple is still together. I would note that the immigration judge found that it was in his belief that this marriage was entered as a sham marriage, simply as a way for her to continue working in the U.S. It's my belief that if she had entered into a sham marriage, that she would have gone about it in a perhaps more prudent manner in terms of the petition she, in terms of the information she would have accumulated. When you look at this woman, you look at the record, you look at the testimony of both her and her husband, I mean, with all due respects to him, this woman entered this country on a visa that was obtained for her through the person that first employed her when she came into the country. The woman testified that for approximately two years, she was being paid in Thai currency because she thought that was normal, Your Honors. Her husband had testified that when they initially lived in with somebody, at the first place they lived at, that lease was entered into by the petitioner and a friend of hers because they testified that the husband's credit was not sufficient to put them on the lease. The husband testified that over the years to date, he's still at best, he's transient in his work. He's not held a steady job. He's had health problems. He testified that the times when he did work, he would work approximately two to four hours a day. He would get paid under the table, so there wouldn't have been W-2s involved there in terms of proving so that they could later use to file their income taxes together. And so, Your Honor, also the couple never testified to living apart. I'm sorry, they never testified to that they ever intended to divorce. They never testified. Nobody, no evidence was presented that there was other people involved in this marriage, that they were dating other people.  Additionally. Well, if it's not, if in fact that it was initially a sham marriage, do you think that under the law you can save it later by finding subsequent true love? I don't think so. I mean, you have to show in the first instance that it wasn't a sham. I agree, Your Honor, and unfortunately, I understand that there's a lack of evidence from the first few years, but they both did testify that they were together. They both testified that they split up in, I'm sorry, that they were married in 89. In 92, they both testified that he had gone to Louisiana so he could be with his sick mother, who subsequently died. Unfortunately, they got the period of time in that he was gone wrong, but they both testified consistently with that. They testified that he returned, that they separated in 95 because he had a drinking problem, and then they testified that they got back together in 98. When they got back together in 98, this was a few months before they filed a 751, before I believe the petitioner knew that there was going to be a possibility that she would be denied and that she would be ordered deported. So it's my contention that their marriage is valid, was valid, and it's still valid. Thank you, counsel. Thank you.
judges: D Nelson, Reinhardt, Thomas